OPINION OF THE COURT
Vito M. DeStefano, J.
*1015 In this action to recover damages for, inter alia, breach of contract, the court, on September 17, 18, 19, October 11 and 12, 2012, conducted a trial of the causes of action in the plaintiff Inspectronic’s complaint and the counterclaims in the answer of defendant Gottlieb Skanska, Inc. At the trial, the following witnesses testified: Carmine Giangregorio, mechanical superintendent of Gottlieb, Steven Ghirardi, project manager of Gottlieb, Lionel Galerne, president and owner of Inspectronic, and Mark Judd, president and CEO of Bidco Marine Inc. The court credits the testimony of each of the witnesses in part. To the extent that the witnesses’ testimony was in disagreement on a material issue, the court will note whose testimony it has credited.
In 2003, Gottlieb entered into a contract with the New York City Department of Environmental Protection (DEP) to perform repairs and renovations of part of the reservoir system providing water to New York City. Gottlieb entered into a subcontract with Inspectronic under which Inspectronic was to perform all diving and underwater operations at the site.
The relevant provisions of the subcontract provide as follows:
“1.1 The contract documents (collectively the ‘Contract Documents’), which are incorporated by reference herein insofar as each and every part thereof is applicable to this Subcontract and the Work to be undertaken by Subcontractor hereunder, shall consist of the following:
“(a) This Subcontract Agreement, including any Riders, Progress Schedules and Exhibits annexed to it and made a part of it;
“(b) The Prime Contract including the plans, specifications, general and special conditions, and addenda, if any;
“(c) The shop drawings approved by the Owner or its Architect/Engineer and any coordination drawing issued;
“(d) Site surveys, soil boring tests and logs, and other examinations prepared by or for the Owner regarding the applicable site conditions;
“(e) Change Orders, Field Changes, Requests for Information, Field clarifications and Amplification Drawings, as such terms are generally used and understood in the construction trade; and . . .
“2.1 Subcontractor shall faithfully, and in a good and workmanlike manner in strict accordance with *1016 applicable Contract Documents furnish and perform the following Work required thereunder:
“SEE RIDERS: ‘LISTING OF PLANS, SPECIFICATIONS & ADDENDUMS’
“ ‘SCOPE OF WORK’
“All the foregoing is herein referred to as the ‘Work’ “2.2 Subcontractor shall provide all labor, supervision, materials and equipment necessary for, or incidental to, the successful prosecution and completion of Subcontractor’s Work in the most expeditious and economical manner, consistent with the best industry accepted standards, lawful construction practices and the interests of the Project relating to quality, timely completion, in strict accordance with the Contract Documents. The enumeration of particular items in this Subcontract or in the specifications shall not be construed to exclude other items. The intention of the contract documents is to include all labor, materials, engineering, equipment, transportation, tools, plant, appliances, appurtenances and other facilities, whether specified herein or not, necessary for the proper execution and completion of Subcontractor’s Work. Subcontractor must refer any questions respecting the Contract Documents about which it is in doubt, or which seem to admit to a dual interpretation, to Gottlieb for resolution, by which Subcontractor shall abide. . . .
“3.1 Gottlieb shall pay to Subcontractor for satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of carrying out this Agreement the following compensation (the ‘Contract Price’) “$334,500.00
“(Three Hundred Thirty Four Thousand Five Hundred Dollars and No Cents)
“Said Contract Price shall be subject to additions or deductions as may be herein provided or agreed upon in writing by Gottlieb . . .
“5.6 Notwithstanding anything to the contrary stated herein, Gottlieb does not assure Subcontractor that it shall be able to commence, prosecute or complete the Work at the time stated, or in the sequence, manner or duration provided for in any *1017 Progress Schedule that Gottlieb may provide to Subcontractor, or that the entire Work shall be completed at the time fixed in such Progress Schedule, Gottlieb reserving the right to alter or modify any such Progress Schedule. Subcontractor further agrees to promptly comply with all orders and directions given by Gottlieb, irrespective of whether Subcontractor shall dispute the same in any particular and without awaiting a determination by the Owner or by any other body or tribunal with respect to any such dispute. . . .
“10.1 In the event that the Work shall not be commenced or prosecuted by Subcontractor as provided in this Subcontract; or if the Subcontractor shall fail or refuse to comply with any of the written orders or directions of Gottlieb, or the Owner, either as to rate of progress, manpower, quantity of material or equipment, performance of extra or additional work, omission of work, or as to any other matter affecting the progress or prosecution of the Work; or if Subcontractor shall cause, by any of its acts or omissions, the stoppage, delay or interference with the work of Gottlieb or any other subcontractors; or if Subcontractor shall fail to make, when due, payments to [its] subcontractors, laborers, materialmen, or others to whom it may be indebted; or in the event the Subcontractor files any petition in bankruptcy, whether for an arrangement of creditors or otherwise, or should any such petition be filed by others affecting Subcontractor, or should Subcontractor become insolvent, make [an] assignment for the benefit of creditors or should a Receiver of it[s] property be appointed and should Subcontractor fail to immediately give Gottlieb written notice of the happening of any such event, or should Subcontractor, after due demand, fail to furnish what Gottlieb, in its sole judgment, considers adequate assurances of Subcontractor’s ability to duly and timely complete the Work remaining to be performed; if Subcontractor, in the opinion of Gottlieb, shall materially violate any of the terms of this Subcontract, then Gottlieb shall, after three (3) days written notice to Subcontractor of default hereunder and upon Subcontractor’s failure within that time to cure such default, have the right to take over this Subcontract and complete *1018 the Work under it or, at its option, employ others to complete the Work to be done under it and charge the cost thereof to Subcontractor. . . .
“23.1 Gottlieb, without invalidating the Subcontract, may, at any time require changes in Subcontractor’s Work consisting of additions, deletions or other revisions, with the Contract Price being adjusted accordingly. All such required changes shall be requested in a signed writing and shall be submitted to Subcontractor for its signature. If not otherwise provided for herein, the provisions of the Prime Contract with respect to pricing, approval and performance of extra or change order work or additions, deletions and modifications for the Work shall be applicable to this Subcontractor and fully binding upon the Subcontractor with regard to any such work. Subcontractor will render bills for any additional work at such times and in such form as directed by Gottlieb. For the purpose of checking such bills and any other claims and determining the correctness of the charges, Subcontractor shall also permit Gottlieb to audit its books and hereby authorizes Gottlieb to check directly with the suppliers of labor and materials to confirm the accuracy and correctness of the charges for labor, materials or other items appearing in the Subcontractor’s bill to Gottlieb. Any modification or change of the Agreement providing for the omission of work shall be computed, and the value, when so determined, shall be deducted from the Contract Price as herein provided. . . .
“23.2 The Subcontractor shall not be entitled to receive any extra compensation of any kind whatsoever, regardless of whether the same was ordered by Gottlieb or any of its representatives, unless such extra order is given in writing and signed by the Project Manager of Gottlieb, or other representative of Gottlieb, who is duly authorized to act in his place and stead.”
The subcontract provided for a base contract price of $334,500 and contained seven work items to be performed by Inspectronic. Between July 2004 and February 2008, Inspectronic, through no fault of either party, had completed only the first three of seven work items. During this time, Inspectronic also performed additional work pursuant to nine change orders, *1019 much of which involved the removal of rebar, which had been excluded from the scope of work in items 2 and 4 of the subcontract (addendum A to subcontract: items 2, 4) and which could not be charged back to the DEP (because it was a subcontract exception).
Regarding the work delays at the project, in large measure, they were caused by the difficulty in obtaining DEP approval and orders for water shutdowns that were required to perform the dive work. As a result, there were, in fact, frequent and extended periods during which dive work was not performed.
On April 9, 2008, a meeting was held at which Galerne complained of the costs associated with the mobilizations and demobilizations occasioned by the DEP’s granting, and then abrupt cancellation, of shutdowns. Under the subcontract, Inspectronic was reimbursed for mobilization costs only if the shutdown was cancelled after it arrived at the project site. As a result, Galerne asked that Inspectronic be paid on a “time and materials” basis. Giangregorio told Galerne to submit a letter explaining why he wanted to alter the subcontract terms in this regard. At no time did Galerne threaten to not complete the subcontract work if the subcontract was not modified. Moreover, Gottlieb was aware as early as July 2008 that continuous shutdowns would be granted by the DEP in the winter and spring of 2008 and 2009 so that the project could be completed. Gottlieb did not share this information with Inspectronic.
Shutdowns were planned for parts of the weeks between April 28 and May 12, 2008 in order to install a flow meter. Galerne advised that its decompression chamber was in use at another jobsite and was unavailable for the end of April and the week of May 5, however, it would be available for the week of May 12. Inspectronic later advised Gottlieb that it was unavailable for the week of May 12 as well in light of the death of Galerne’s father. No issue was made by Gottlieb with respect to Inspectronic’s inability to work at the site during the time stated; in addition, the DEP cancelled the shutdown that had been scheduled for the week of May 12, in any event.
Gottlieb did not contact Inspectronic until July 7, 2008, at which time Giangregorio called Galerne requesting a meeting, which took place two days later. At the meeting, they again discussed Galerne’s request to alter the contract to a “time and materials” payment basis as well as scheduling the remaining work, which Gottlieb expected to begin in the late fall. The *1020 court does not credit Giangregorio’s testimony that Inspectronic threatened to “walk off” the site if the subcontract was not altered as demanded. In fact, Giangregorio did not make any notation or record of a threat being made. The court, however, does conclude that Gottlieb asked Galerne to submit a proposal for the completion of work on a “time and materials basis.”
It is undisputed that no dive work was scheduled for the remainder of the year and that between July 10, 2008 and November 26, 2008, there were no written communications between Inspectronic and Gottlieb.
On November 26, 2008, Gottlieb sent a letter to Inspectronic in which it stated the following:
“Since May of 2008 Inspectronic Corporation has consistently and constantly been contacted by Skanska field personnel with no response for manning the project to complete equipment installation which is part of their base contract. Difficult to achieve system shutdowns were scheduled and implemented for this work, scheduled with the input and consent of Inspectronic, but were not carried out due to the failure of Inspectronic’s personnel in manning the site. These non-responsive actions have created a scheduling problem for the completion of the project.
“It is imperative that Inspec[tronic] contact Skanska field personnel to develop a firm and sustainable work schedule for work items to be completed. Work at Shafts 10 and 17 must be done to complete the contract work. Since Skanska’s repeated requests for resuming work have not been responded to, we must consider this as abandonment. Therefore, we herewith issue Inspectronic a seventy-two (72) hour NOTICE OF DEFAULT.
“In order for Inspectronic to remedy this default, a full accounting and scheduling of the remaining project work must be done within (72) hours of fax receipt of this letter. Inspectronic’s failure to remedy this default within seventy-two (72) hours will result in Skanska proceeding with what ever means necessary to complete Inspectronic’s contractual obligations including notification to your bonding company and, if necessary, securing the services of another diving company.
*1021 “Any and all costs above available contract value incurred by Skanska associated with the completion of this work will be applied to Inspectronic’s account. Your present retainage on contract work already completed will be held and, if necessary, used to pay for these incurred additional costs. Notification to the appropriate City agency as to the inactions of Inspectronic will be given upon failure to satisfy its contractual obligations.
“You are hereby directed to immediately recommence and complete available work on the above referenced project and comply with the terms and conditions of your subcontract.”
However, as noted, the testimony was undisputed that no work was scheduled during that period and that at no time between May 2008 and November 26, 2008 did Gottlieb schedule or ask Inspectronic to perform any work at the site. Nor did Gottlieb ask or obtain shutdowns from the DEP during that time. Accordingly, the letter was substantially false and prepared in bad faith in an effort to establish a breach which would permit termination of the contract by Gottlieb.
Also relevant is an internal email by Steven Ghirardi, the project manager, sent to two Gottlieb principals in which he stated the following:
“Gents
“AHHHH the power of a 72 hour notice
“We just received an irate phone call from Lionel Galerne of Inspectronic about the 72 hour notice I sent this morning.
“He takes great offense at its content.
“We reminded him that we have been waiting since July 9 for him to get back to us with new rates and time durations on the remaining work.
“He wants to do the rest of the work on T & M.
“He’ll get back to us soon . . . maybe.
“This sets up a situation with BIDCO.
“Please advise.”
Subsequently, Inspectronic responded with the following letter dated December 9, 2008:
“In reference to your fax on November 26, 2008, we respectfully disagree with your position that we are in default of contract DEL-125-G. Inspectronic Corporation has completed a majority of its contract *1022 items without delay and Inspectronic has not caused any delay in your contract work. In fact, we have on numerous instances been requested by Skanska and the owner to mobilize men and equipment, only to be told at the last minute to stand down and wait for rescheduling. The result of the continued delays and poor planning has caused this contract to drag on for nearly 5 years.
“IC has continuously responded to your request to be onsite to perform the specified contract work. A majority of this work has been completed despite unprecedented increases in the cost of front office documentation, safety requirements, specialized union labor, equipment upgrades, fuel and insurance.
“As you will recall in May of 2008, a meeting was held in your office at Shaft 10. The purpose of this meeting was to discuss scheduling for the upcoming winter shutdown period and to address our concerns as to the continued delays and cost escalations in the completion of this contract work.
“It was agreed at this meeting that IC would complete the remaining items of this contract on a T & M basis and that we would submit a scheduled estimate to include costs estimates and manpower requirements to complete the remaining contract items.
“At this time we are completing your request for the above-mentioned requirements and will be submitting this in the next few days.”
On December 12, 2008, Gottlieb responded to Inspectronic’s letter as follows:
“A 72 hour Notice of Default was issued to you on November 26, 2008. Other than a telephone call to our superintendent on the day when you received the notice and a faxed letter dated December 9, 2008 refuting the 72 hour notice content, Inspectronic has not met the requirements of the 72 hour notice.
“The only option satisfactory to Skanska for Inspectronic to avoid being terminated from the above referenced project is for Inspectronic to re-man the project and complete the contract work at the agreed to prices stipulated in the signed subcontract. No other option will be accepted.
*1023 “Please advise as to your decision no later than close of business on Monday December 15, 2008.”
The same day, Inspectronic replied to Gottlieb as follows:
“Reference your Fax of December 12, 2008 Notice of Termination although we respectfully disagree with your hostile position to this dispute we shall under duress remobilize our crew and equipment to shaft 17 on January 5, 2008.
“IC requests that you make the necessary arrangements to allow full and complete access to shaft 17. We will require full shut downs during normal business hours Monday thru Friday 07:00 to 15:30. If shut downs or access is not granted or delayed for any reason, IC will demobilize its crew and equipment until access is granted. All further mobilizations and demobilizations for each remaining contract item, shall be back charges to Skanska on a cost plus basis.”
On December 18, 2008, Gottlieb replied:
“We are in receipt of your letter dated December 12, 2008 and received by fax in our field office on December 15, 2008 in regard to the Skanska letter of termination from the above referenced project. “Through all the rhetoric in your letter, Inspectronic Corporation has not stated that they will perform the remainder of the contract work at the contract price and under the shutdown requirements set forth by the NYCDEP as requested in our letter ‘NOTICE OF TERMINATION’ dated December 12, 2008. Additionally, you did not meet the time or action requirements of the 72 hour notice, dated November 26, 2008. Based on this, Skanska continues to deem you as non responsive to our termination notice issued in accordance with Subcontract Article 10—Termination.
“Further to your letter of December 15, 2008, the Skanska December 12, 2008 letter was not hostile, nor is the position of Skanska on this matter. It is a simple statement of fact that Inspectronic Corporation has not responded to the needs of the project and has demanded that the remaining contract work be completed on a time and material basis rather that the agreed to lump sum prices set forth in your signed subcontract. Skanska has never agreed to complete this work on a time and mate *1024 rial basis.
“Additionally, your request for shutdowns for extended and continuous periods of time beginning January 5, 2009, is unreasonable, knowing full well that shutdowns are not a negotiable commodity with the NYCDEP. Inspectronic Corporation, by previous experience, knows this to be fact and this condition is included as part of the NYCDEP contract.
‘Your response confirming that Inspectronic Corporation will complete the contract work under the lump sum agreement and Skanska’s required scheduling, and in accordance with the NYCDEP’s standard shutdown protocols, is required before the close of business on December 19, 2008. If this is not received the termination will be effective for the cause of non compliance with the subcontract agreement.”
On December 19, 2008, Inspectronic responded with the following:
“Reference your Fax of December 18, 2008 we do not consider our request for a shut down at shaft 17 on January 5, 2009 to be rhetoric. But rather an affirmation to our willingness to complete our contract work. However your continued insults and refusal to schedule a shut down as you have demonstrated undermines your demand letter of November 26, 2008 and reaffirms our contention that this [is] merely a ploy on your part to terminate our contract in a hostile manner.
“We once again demand that the DEP be put on notice of our intent to mobilize our men and equipment to shaft 17 for the continuation of our contract work. Our position is clear to the fact that we have given you proper notice and adequate time for you to schedule this shut down work and by doing so we are not in violation of our contract terms. If this shut down is not possible then it is incumbent on you to give notice of your inability to schedule this work and not to just merely dismiss us as being non compliant to your needs.
“As to your refusal or inability to give Inspectronic continued shut downs during normal business hours we respectfully ask that this be considered a scheduling dispute not a refusal to continue our *1025 contract work and that this dispute be brought to attention of the DEP for resolution as we have done so in the past.”
The same day, Gottlieb replied:
“We vehemently disagree with the contentions of your letter dated December 19, 2008 “Please advise us immediately if you will continue with your contract work based on the lump sum amount as per our subcontract agreement.
“With respect to your scheduling problem, we have not received any schedule interruption letters from you in accordance with the Dispute Resolution requirements under our subcontract with you and under the Prime contract with the Owner. Nevertheless, our termination notice is based on your breach of the subcontract.
“We stand ready to meet with you to discuss these issues once you have confirmed in writing that you will continue based on the lump sum amount of your subcontract.”
On December 30, 2008, Gottlieb sent a letter to Inspectronic terminating the subcontract: “As per the requirements of our letter to you dated December 19, 2008; and by your failure to meet its requirements through no response to it, Skanska Mechanical and Structural Inc. has no choice but to terminate your subcontract No.644.005 effective immediately.”
Gottlieb subsequently entered into a subcontract with Bidco to finish items four through seven. In the subcontract with Bidco, unlike in the subcontract with Inspectronic, the removal of rebar was not excepted. As a result, Gottlieb benefitted because it was able to charge the DEP for the work.
Bidco completed the work in its subcontract; an additional 20 change orders were issued in connection with its work, all of which were completed by Bidco.
Based on the foregoing, the court concludes that Gottlieb wrongfully terminated the subcontract with Inspectronic. In this regard, Inspectronic, in its December 12, 2008 letter, indicated that it would return to the worksite and perform the subcontract “under duress,” which, in light of prior representations by it and the demands by Gottlieb in its letters, suggests that Inspectronic was abandoning its request to be paid for all project work on a time and materials basis. That Inspectronic did not explicitly affirm that it would continue on the *1026 subcontract lump-sum payment basis is not a material breach of contract that permitted Gottlieb to terminate the subcontract.* In this regard, section 10.1 of the subcontract required that Inspectronic “comply with any of the written orders or directions of Gottlieb, or the Owner, either as to rate of progress, manpower, quantity of material or equipment, performance of extra or additional work, omission of work, or as to any other matter affecting the progress or prosecution of the Work” and to give “adequate assurances of . . . [its] ability to duly and timely complete the Work remaining to be performed.” The court does not consider the failure to explicitly promise to continue working at the “lump-sum” price a breach of the subcontract provisions cited.
Even assuming that the failure by Inspectronic to give an explicit assurance regarding its acceptance of lump-sum payments for future work could constitute a breach of contract, and that the response it provided was insufficient, such failure would not constitute a material breach of contract (see e.g. Jacob & Youngs, Inc. v Kent, 230 NY 239 [1921]). Moreover, Inspectronic’s requests regarding the scheduling of shutdowns and its statement that future mobilizations and demobilizations would be charged against Gottlieb on a cost plus basis, do not amount to an anticipatory repudiation of contract that permitted Gottlieb to terminate the subcontract (see Apostolou v Mutual of Omaha Ins. Co., 72 AD2d 781 [2d Dept 1979] [repudiation must be “complete”]).
Accordingly, Inspectronic established that Gottlieb wrongfully terminated the contract.
Regarding damages, Gottlieb argues that: Inspectronic could not, in any event, prove lost profits as a measure of damages respecting the four uncompleted items of work as it grossly underbid the job. In fact, Inspectronic sought to change the payment terms of the subcontract to a time and materials basis because it was losing money. Accepting Inspectronic’s projection of lost profits for the base work would mean that it would have earned more than 100% profit if it had completed the remaining base work, i.e., $121,208 profits with $119,392 costs. However, that is not a credible projection of damages in light of Galerne’s effort to modify the subcontract payment terms, his admissions regarding the increased cost of work and materials *1027 during the five years between execution of the subcontract and performance, and the minimal profit realized by Bidco for doing the same work. In no event is Inspectronic able to recover lost profits in connection with the change orders on items four through seven inasmuch as such work was not contemplated at the time of the breach and there was no requirement in the subcontract that any of the change order work would be awarded to Inspectronic.
In response, Inspectronic argues that Galerne testified credibly and in detail regarding the lost profits it incurred as a result of Gottlieb’s breach as to both the base contract and the change orders. The time estimated by Inspectronic and Bidco to complete the four items and the time actually expended was almost identical except for one item, which took Bidco 10 days longer than estimated. However, unlike Bidco, Inspectronic owned its own equipment, hired local laborers, and dove on mixed gas, which would have reduced time and expenses. In addition, the CEO and president of Bidco had to visit the site on numerous occasions because of cost issues. Accordingly, Bid-co’s completion of the four items provides evidence of what was completed, thereby supporting Inspectronic’s claim for lost profits, but the cost to Bidco is not relevant. Regarding the change orders, Galerne reviewed the daily work records and confirmed that all of the change order work was related to the base contract items. Moreover, based on the standard rates allowed to be charged by the DEP and that Inspectronic owned its equipment, the profit margin on the change order work would have been 38.73%. Galerne calculated the lost profit on the change order work to be $173,387.73 based on total payments to Bidco for change order work in the amount of $447,711.75.
Regarding lost profits incurred in connection with the base work, the court credits the testimony of Galerne and the evidence proffered by Inspectronic. Damages in an action for breach of contract are intended to place the injured party in the position he would have been in had the contract been fully performed (see Brushton-Moira Cent. School Dist. v Thomas Assoc., 91 NY2d 256 [1998]). Lost profits are recoverable if: it is certain that the loss was caused by the breach, the amount of loss is established with reasonable certainty, and the damages were fairly within the contemplation of the parties at the time of contracting (see Kenford Co. v County of Erie, 67 NY2d 257 [1986]).
*1028 At bar, Inspectronic proved that it incurred reasonable lost profits in the amount of $121,208 on the four open subcontract items. In this regard, Galerne’s estimates were based on updated labor costs, the duration of work, the fact that Inspectronic did not have to rent equipment or transport/ accommodate nonlocal workers, and the continuous shutdown time actually provided by the DEP, thereby reducing mobilization costs. Moreover, as noted by counsel for Inspectronic, Gottlieb did not adequately refute Inspectronic’s showing or explanation of lost profits for the base subcontract work.
Regarding Inspectronic’s claim for lost profits based on the change orders issued in connection with the remaining items on the subcontract, as noted Bidco completed not only the base items but also every change order. The court concludes, contrary to Gottlieb’s contentions, that Inspectronic may recover lost profits for the change order work, which it would have completed but for Gottlieb’s wrongful termination of the subcontract. The damages a party may recover for breach are those that ordinarily and naturally flow from the breach, are proximately caused by the breach, are certain or capable of ascertainment, and are not remote, speculative or contingent (see Fruition, Inc. v Rhoda Lee, Inc., 1 AD3d 124, 125 [1st Dept 2003]). In determining what was contemplated by the parties at the time the agreement was entered into, the court should consider the nature, purpose, and circumstances of the contract (see Bi-Economy Mkt., Inc. v Harleysville Ins. Co. of N.Y., 10 NY3d 187, 193 [2008]).
As the Court of Appeals held in Ashland Mgt. v Janien (82 NY2d 395, 403 [1993]):
“A party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty. The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about. It is only necessary that loss from a breach is foreseeable and probable (see, Restatement [Second] of Contracts § 351; 3 Farnsworth, Contracts § 12.14 [2d ed 1990]).”
*1029 Here, the subcontract terms, which include any change orders issued and allow that Gottlieb may, “at any time,” require changes in Inspectronic’s work, the subcontract’s performance, the nature of the work and the practice of the parties and in the industry, all support the conclusion that the parties contemplated the issuance of change orders and that Inspectronic would perform all the change order work in connection with the items listed in the subcontract. In fact, all change orders issued in connection with the first three items were completed by Inspectronic and all change orders issued in connection with the remaining contract items were completed by Bidco.
In consideration of the change orders issued, the nature of the work done in connection with the change orders and Galerne’s testimony concerning the time, materials, rate and duration, damages in the form of lost profits in the amount of $173,387.73 were sufficiently established (see Ashland Mgmt. v Janien at 403 [“The second requirement, that damages be reasonably certain, does not require absolute certainty. Damages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation”]).
Accordingly, Inspectronic is awarded damages in the amount of $304,852.13 (representing lost profits plus $10,000 in retainage), with interest from March 1, 2009 (CPLR 5001 [c]).

 Nor does the court consider Inspectronic’s failure to provide a statement as to the time and material rates as requested by Gottlieb to be a breach of the subcontract, let alone a material one.